## Case No. 4,686.

FARRIN v. CRAWFORD et al.

[2 N. B. R. 602 (Quarto, 181); 1 Chi. Leg. News, 342.][1]

Circuit Court, S. D. Ohio. 1869.

[1] [Reprinted from 2 N. B. R. 602 (Quarto, 181), by permission. 1 Chi. Leg. News, 342, contains only a partial report.]

E. P. Bradstreet and L. French, for creditors.

Judge Coffin, for Farrin and assignee.

SWAYNE, Circuit Justice, having heard the whole case anew, announced an elaborate opinion, of which the following is an abstract:

T. W. Farrin was for several years an extensive lumber-dealer in Cincinnati, and was also, to a large extent, engaged in various outside speculations. His legitimate business prospered as late as February, 1868, and he made a large amount of money therein, while his outside operations were uniformly disastrous. He kept a very full set of books in his lumber business, under a competent book-keeper, trained to that calling by himself, and had trial balances made out every sixty days, and annual balance sheets, all of which he was in the habit of examining when made out. He also kept a private memorandum book of a portion of his outstanding paper, not all. In November, 1868, he became much embarrassed, and about the middle of the same month was compelled to allow a note of over two thousand dollars to go unpaid, and which remains so, although he paid a small part of it at maturity. The Cincinnati, Hamilton & Dayton Railroad Company was in the habit of buying their lumber from him, and he, in turn, had most of his lumber brought to town over their road, paying the freight bills at the end of each month. November 1st he paid thus, in cash, four thousand five hundred dollars. But on the 24th or 25th of same month they presented their bills again for amount then due, about three thousand eight hundred dollars, being in advance of the end of the month. Farrin did not pay, but made vigorous efforts to obtain a special order for lumber for building cars, promised some months previously—with which to offset the freight-bills—which, meantime, ran on to about six thousand dollars, at the end of the month. He obtained the verbal order, November 30th, and the written approval of it, December 1st, 1868, the transaction being closed upon the 2d, and lumber delivered on that and one or two following days, to the amount of fifteen hundred dollars more than his freight-bills, he receiving that difference in cash. On Friday, December 4th, he made his assignment to Green, signing it in the morning and leaving it with his attorney for delivery. He had consulted with the assignee about making it early in that same week, he (Green) being his creditor without security, for over thirty thousand dollars. At the time of making the assignment he had the books of his lumber business before him, but not a full statement of its condition, and made "a rough estimate" that he had a surplus of from twelve to twenty thousand dollars over his liabilities in the lumber business; he knew he had debts from seventy-five to ninety thousand dollars, but estimated his assets at one hundred and two thousand dollars. It would seem that he did not include, in this estimate of liabilities, all his outside obligations, and swears he did not include the endorsements for Whately & Co., not then supposing he would have to pay them. On December 4th, after executing the assignment, he collected from a debtor, through the agency of his assignee, twelve hundred and eighty-eight dollars cash, and used it for family and other expenses. He left town the same evening, and was absent three weeks—going for his family—and testifies that it was only on his return here that he learned he was insolvent—thirty thousand dollars short of solvency. But he admits that the statement, which showed this, was made up by his book-keeper from the books of his lumber business. The evidence does not show what he did with the fifteen hundred dollars received from the Cincinnati, Hamilton & Dayton Railroad Company just before the 4th of December, except that four hundred dollars was found by the assignee in the safe, which may be presumed to have formed a part of it; while it is also a certain presumption that he either paid some debts with the balance, or used it for his private purposes. It did not go to the assignee—thus making certainly two thousand three hundred and eighty-eight dollars cash received and retained by the assignor at the very time he makes an assignment purporting to be of all his property for the benefit of his creditors.

Now, while I have held, and still emphatically hold that an assignment, such as this, purports to be, is valid and proper when made in good faith, it is yet to be subjected to the sharpest scrutiny, and any badge of fraud that attaches itself in the light of extraneous circumstances will, unless fully and satisfactorily explained, be fatal to its validity, and the arm of the bankrupt law will sweep it away, and subject the person and estate to its own provisions. In this respect I consider all assignments by debtors to be subject to the general rule contained in the statute of Elizabeth, exemplified in Twyne's Case and the many other subsequent decisions following it, all of which render void as to creditors all assignments at all tainted with fraud.

Testing this transaction by that standard, it cannot be upheld. It does not do that which it purports to, but on the contrary, the assignor, through the agency of the assignee himself, retains a portion of the estate and

converts it to his own use—to an amount much greater than he could hold under the exemption laws. I do not mean to impute any intention to defraud or do any wrong to either party, but here are the facts, and the legal result is inevitable. On this ground, therefore, while differing from the district judge as to the effect of the assignment ipso facto, I must sustain his decision as to the same, when viewed in the light of the testimony adduced relative to it, and hold it to be an act of bankruptcy.

But in addition to this, a clear case of preference has been made out. as to the Hamilton and Dayton Railroad freight-bills. The testimony shows clearly, and it is admitted, that Farrin was insolvent, largely and hopelessly, in the month of November, 1868; but he says he did not know it till after the assignment. But he knew his paper was under protest since the middle of November, and remained unpaid; that he owed at least from seventy-five to ninety thousand dollars, against which he could count up only one hundred and two thousand dollars assets, and this by "a rough estimate." And he admits himself that the statement afterwards made up, showing him to be twenty to thirty thousand dollars insolvent, was made from his lumber-business books by his own bookkeeper; and this does not include his "outside operations." Making all possible allowances, the conclusion is irresistible that he either knew he was insolvent when he thus paid the railroad bills, or else wilfully and purposely refuses to know, by shutting his eyes to the facts before him, for, as before remarked, he was an accomplished bookkeeper himself. In either case the result arrived at is the same—in the one a fact, in the other an unavoidable legal inference, equally fatal.

Assuming, then, that he was insolvent and knew it, it follows at once that any payments then made by Farrin to any creditor in full, were made with the intent to prefer, and therefore acts of bankruptcy within the meaning of section thirty-nine. But aside from this, the circumstances under which this payment was made, show a real purpose to pay in preference—an active and successful effort on Farrin's part to obtain the order for lumber from the railroad company, for the express purpose of paying their freight-bill, commencing with the presentation of the bill, November 24, and continued until the order was given, just before the assignment was made.

Upon the whole case the creditors are entitled to a decree of bankruptcy against Farrin, as prayed for by them, as well for the first as the second reasons above given, and the same is granted, and complainant's bill dismissed. But I will allow the costs of his bill to be paid out of the estate.